UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:11-cr-79 |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| THERON E. LEWIS (1), | : | |
| KEITH A. WATSON (2), | : | |
| | : | |
| Defendants. | : | |

**DECISION AND ENTRY: (1) DENYING IN PART AND GRANTING IN PART
DEFENDANT LEWIS' MOTION TO SUPPRESS (DOC. 27); AND (2) DENYING
DEFENDANT WATSON'S MOTION TO SUPPRESS (DOC. 28)**

This criminal case is before the Court on Defendants' Motions to Suppress. (Docs. 27, 28). Defendants seek an order suppressing identification testimony of certain eyewitness victims arguing that photo lineups used were unduly suggestive and that the identifications made by the victim witnesses using the lineups have no independent basis of reliability. (Docs. 27, 28). The Government filed a memorandum opposing Defendants' Motions. (Doc. 36). The Court held hearings on Defendants' Motions on September 22, 2011and October 20, 2011. (Docs. 51, 52). Following the hearings, the parties filed briefs and subsequent responses. (Docs. 53-58). The Motions to Suppress are now ripe for decision.

## I. FACTS

Defendants Theron Lewis and Keith Watson were indicted on May 25, 2011 for allegedly committing a robbery in violation of 18 U.S.C. § 1951(a) ("the Hobbs Act"), for allegedly using a firearm in furtherance of a crime of violence in violation of 18 U.S.C.

§ 924(c) & (o), and for allegedly causing the death of a person through the use of a firearm in violation of 18 U.S.C. §§ 924(c) and (j)(1). (Doc. 4). Defendant Thomas was also indicted for being a previously convicted felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*Id.*)

The facts giving rise to the indictment occurred on April 3, 2007, when three armed men invaded a residence at 1637 Harold Street, Dayton, Ohio and committed a robbery. (*Id.*) According to the victim witnesses inside the residence at the time of the robbery, the first intruder entered the residence and proceeded to a back bedroom where brothers Dwayne Burg, Jr. and Torrence Burg were located along with their father, Dwayne Burg, Sr. (Doc. 51). The second intruder entered the residence and stood near the doorway of the bedroom, entering and exiting it throughout the robbery.[1] (Doc. 51). The third intruder stood near the front door throughout the robbery. (Doc. 51). During the robbery, the first intruder shot and killed Dwayne Burg, Sr. (Docs. 51, 52).

According to Dwayne Burg, Jr., the first and second intruders were in his bedroom for more than a minute, but less than two. (Doc. 51, PAGEID 200). Aside from glancing at the second intruder,[2] Dwayne Burg, Jr. focused his attention on the first intruder, who, according to Dwayne Burg Jr.'s testimony at the suppression hearing, wore nothing

---

[1] Dwayne Burg, Jr. subsequently identified a former acquaintance of his, Thomas "Tom-Tom" Watson as the second intruder. Thomas Watson is now deceased.

[2] Dwayne Burg, Jr. testified that the second intruder had brown skin, a "fat forehead," wore a black hooded zip-up sweatshirt with a mask covering his mouth and nose. (Doc. 51, PAGE ID 199-202).

2

covering his face. (Doc. 51, PAGEID 200-201, 204). Dwayne Burg, Jr. denied ever describing the first intruder as having any facial covering. (Doc. 51, PAGEID 204).

Torrence Burg, who was also in the bedroom during the robbery, testified that he directed his attention to first intruder during the robbery. (Doc. 51, PAGEID 272). Torrence Burg estimated that the first intruder was in the room for 5 to 10 minutes and stood approximately an arm's length and a half from him . (Doc. 51, PAGEID 272). At the suppression hearing, Torrence Burg stated that the first intruder had dark skin, a low haircut, scraggly beard growth, black clothing, and nothing covering his face. (Doc. 51, PAGEID 281-282). He denied telling police that the first intruder possibly wore a black bandanna in an attempt to cover his face, and instead, testified that his description of the bandanna applied to another intruder. (Doc. 51, PAGEID 283).

Brandy Hurston, the sister of Dwayne, Jr. and Torrence Burg, was lying on her stomach on the floor of the front living room during the robbery, only five to six steps from the third intruder. (Doc. 51, PAGEID 300-301). During the robbery, Ms. Hurston directed her attention straight-ahead, looking into the bedroom where her brothers and father were located with the first intruder. (Doc. 51, PAGEID 312, 315). At certain points, however, Ms. Hurston's attention was drawn to the front door area where her one-year old son was sleeping "right next" to the third intruder. (Doc. 51, PAGEID 312-314). She testified that she had a "very long, steady look" at the unmasked third intruder, who continuously pointed a gun at her, yelling "shut up, Bitch, quit looking at me." (Doc. 51, PAGEID 299, 312-314). Ms. Hurston testified that she caught a glimpse of the side of the

first intruder's uncovered face as he exited the residence. (Doc. 51, PAGEID 331).

Cassandra Powers, a Burg family friend, was lying "face down" in the kitchen during the robbery with a view of the third intruder. (Doc. 51, PAGE ID 242). Ms. Powers was approximately 25 to 30 feet from the third intruder, who was in her direct line of vision. (Doc. 51, PAGE ID 232). According to Ms. Powers, she viewed the third intruder throughout the entire five to eight minutes she estimated the robbery took place. (Doc. 51, PAGEID 232). Ms. Powers also had a good opportunity to see the third intruder's unmasked face. (Doc. 51, PAGEID 233, 246). At the suppression hearing, Ms. Powers described the third intruder as wearing dark clothing, a short haircut, somewhat light complected, and approximately five feet, eight inches tall. (Doc. 51, PAGEID 246).

In the days and weeks following the robbery, all of the aforementioned witnesses were shown numerous photos (approximately 20 lineups), and all of the witnesses were unable to identify a suspect in those photo lineups.[3] (Doc. 52, PAGEID 363-369).

On May 29, 2009, over two years after the robbery, Dwayne Burg, Jr. watched a noon news broadcast on WHIO TV reporting the arrest of Defendants Theron Lewis and Keith Watson in connection with a separate shooting incident in Dayton. (Doc. 51, PAGEID 185-186, 209-210). The news broadcast displayed "mugshot" photos of both Theron Lewis and Keith Watson. (Doc. 51). Upon viewing the WHIO news broadcast, Dwayne Burg, Jr. identified Theron Lewis as the first intruder who shot his father. (Doc.

---

[3] According to Dwayne Burg, Jr., he was uninterested in identifying anyone in the photographic lineups presented at that time because he was only interested in "keeping it in the streets." (Doc. 51, PAGEID 205).

51, PAGEID 185).

Torrence Burg viewed a rebroadcast of the WHIO news story that evening. (Doc. 51, PAGEID 268). Upon viewing the news broadcast, Torrence Burg identified Theron Lewis as "[t]he man that shot my father" without question and for certain. (Doc. 51, PAGE ID 268-269).

Brandy Hurston received a call from her brothers and was told to watch the news broadcast. (Doc. 51, PAGEID 322). Ms. Hurston viewed a recorded version of the news broadcast and identified Keith Watson as the third intruder who stood by the front door during the robbery. (Doc. 51, PAGEID 322-326). Ms. Hurston was not able, however, to identify Theron Lewis as an intruder upon viewing the news broadcast. (Doc. 51, PAGEID 324-327). After viewing the news broadcast, Ms. Hurston spoke to her brothers about what she saw, and her brothers informed her that they identified Theron Lewis as the first intruder who shot their father. (Doc. 51, PAGEID 325). Cassandra Powers did not see the news broadcast. (Doc. 51, PAGEID 239).

Within days after the news broadcast, Detective Michael Galbraith of the Dayton Police Department ("DPD"), originally assigned to investigate the homicide of Dwayne Burg, Sr., received a call from a victim witness advocate indicating that Dwayne Burg, Jr. would like to speak with him about his father's homicide. (Doc. 52, PAGEID 371). Detective Galbraith then called Dwayne Burg, Jr., who told the detective that he saw the individual who shot his father on a WHIO news broadcast and that the individual's nickname was "T-Streets." (Doc. 52, PAGEID 373).

Upon consulting with the DPD Homicide Unit, Detective Galbraith learned that Detective Greg Gaier was working an active homicide case in which "T-Streets" had been recently arrested in connection therewith. (Doc. 52, PAGEID 373, 411). Detective Gaier informed Detective Galbraith that T-Streets' real name is Theron Lewis and "that he had a photo spread of that individual" he used in connection with his homicide investigation. (Doc. 52, PAGEID 373). The photo lineup created by Detective Gaier contained the same photo of Theron Lewis that WHIO displayed on the news broadcast on May 29, 2009. (Doc. 51). Lewis' photo appeared as the first photo in the lineup created by Detective Gaier. (Gov.'t Exhibits 3-5).

Detective Galbraith took the same photo lineup he received from Detective Gaier and presented it to Dwayne Burg, Jr. and Torrence Burg separately on June 8, 2009. (Doc. 52, PAGEID 374-377). Both Dwayne Burg, Jr. and Torrence Burg identified Theron Lewis as the first intruder without any hesitation. (Doc. 52, PAGEID 378; Doc. 51, PAGEID 187, 271).

Approximately three weeks later, on July 1, 2009, Detective Gailbraith met with Brandy Hurston and presented her with the same photo lineup he presented to Dwayne Burg, Jr. and Torrence Burg. (Doc. 52, PAGEID 378). When presented with the lineup, Ms. Hurston identified Theron Lewis. (Doc. 51, PAGEID 327; Doc. 52, PAGEID 378). At the suppression hearing, Ms. Hurston was asked and answered:

> Q.     All right. So when Detective Galbraith presented this photo
> spread lineup to you, you had pieced together, because you
> had seen Theron Lewis on the news and you had heard what

your brothers had said, that Theron was the guy that was in the
bedroom, is that what your testimony is?

    A.    Basically, yes, sir.

(Doc. 51, PAGEID 327).

Although Ms. Hurston recognized Keith Watson as the third intruder at the time she

viewed the WHIO news broadcast, she was not presented with a photo lineup containing a

picture of Watson until January 22, 2010.  (Doc. 52, PAGEID 427).  On that date,

Detective Gaier, who took over the homicide investigation of Dwayne Burg, Sr. in January

2010, approached Ms. Hurston with a lineup containing a photo of Watson because he

knew Watson associated with Theron Lewis and was a co-suspect with Lewis in a separate

homicide investigation.  (Doc. 52, PAGEID 419-420).  Ms. Hurston positively identified

Waston as the third intruder.[4]  (Doc. 54, PAGEID 428).

Detective Gaier also contacted Ms. Powers on January 22, 2010, and requested that

she view a photo lineup.  (Doc. 51, PAGEID 234; Doc. 52, PAGEID 428-429).  Upon

viewing the photo lineup containing a photo of Keith Watson, Ms. Powers was unable to

positively identify any one suspect, but was able to narrow the possibilities to the persons

shown in the first and fourth photographs.  (Doc. 51, PAGEID 235; Doc. 52, PAGEID

---

[4]  At that same encounter, Detective Gaier redisplayed the same, though unmarked,
lineup with a photo of Lewis that Detective Galbraith presented to her in July 2009.  (Doc. 52,
PAGEID 428).  At that time, Ms. Hurston reconfirmed her identification of Lewis photo as the
first intruder.  (Doc. 52, PAGEID 428). Dwayne Burg, Jr. and Torrence Burg also reconfirmed
their identifications of Theron Lewis on January 22, 2010 upon presentation of the same, though
unmarked, photo lineup shown to them by Detective Galbraith in June 2009.  (Doc. 52, PAGEID
424-426).

429). The first photo in the lineup showed Keith Watson. (Gov.'t Exhibit 8).

On January 24, 2010, Detective Gaier presented Ms. Powers with a different photo lineup containing a different, older photo of Keith Watson. (Doc. 51, PAGEID 236-236). The photo of Watson used in the photo lineup presented to Ms. Powers on January 24, 2010 was taken approximately two weeks after the April 3, 2007 robbery at 1637 Harold Street, and was displayed as the fourth photo in the lineup. (Doc. 52, PAGEID 430, 432; Gov.'t Exhibit 9). On that date, upon viewing the second lineup, Ms. Powers identified Keith Watson as the third intruder. (Doc. 51, PAGEID 236, 237; Doc 52, PAGEID 432).

Defendant Theron Lewis moves to suppress identification testimony of Dwayne Burg, Jr., Torrence Burg and Brandy Hurston. (Doc. 27). Defendant Keith Watson moves to suppress the identification testimony of Cassandra Powers and Brandy Hurston. (Doc. 28). The Government filed a memorandum opposing both Motions. (Doc. 36).

### III. ANALYSIS

In addition to Sixth Amendment safeguards such as "the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution[,]" the principles of due process provide an additional "check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, --- U.S. --- , --- S.Ct. --- , 2012 WL 75048 (Jan. 11, 2012).

This due process check "prohibits the use of identifications which under the totality

of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *United States v. Peterson*, 411 Fed. Appx. 857, 864 (6th Cir. 2011) (citing *Carter v. Bell*, 218 F.3d 581 (6th Cir.2000)). In determining whether an unacceptable risk of misidentification with regard to a photo lineup exists, courts use "a two-step analysis[.]" *United States v. McComb*, 249 Fed. Appx. 429, 437 (6th Cir. 2007) (citing *Ledbetter v. Edwards*, 35 F.3d 1062 (6th Cir.1994)).

The first step requires a determination as to "whether the pretrial identification was unduly suggestive," which "is a fact-specific determination[.]" *Id.* (citing *Ledbetter*, 35 F.3d at 1070-71. To make this determination, "the court may consider 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *Id*. (citing *United States v. Sanchez*, 24 F.3d 1259 (10th Cir.1994)); *see also United States v. Wade*, 388 U.S. 218 (1967).[5] If "the first step of the requisite analysis ends in the government's favor, [the court] need not address" the second step of the inquiry. *United States v. Stamper*, 91 Fed. Appx. 445, 462 (6th Cir. 2004).

If the identification procedure was unduly suggestive, the Court proceeds to the second step to determine "whether the totality of the circumstances surrounding the

_____

[5] The Supreme Court gave some examples of suggestive procedures, such as "that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect." *Wade*, 388 U.S. at 232-33.

[witnesses'] identification indicates that the identification was nonetheless reliable."

*McComb*, 249 Fed. Appx. at 437. The factors considered in making this determination

include: "1) the witness's opportunity to view the criminal at the time of the crime; 2) the

witness's degree of attention; 3) the accuracy of the witness's prior description of the

criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time

between the crime and the confrontation." *Id*. (citing *United States v. Beverly*, 369 F.3d

516 (6th Cir.2004); *Neil v. Biggers*, 409 U.S. 188 (1972)). Where "the indicia of reliability

are strong enough to outweigh the corrupting effect of the police-arranged suggestive

circumstances, the identification evidence ordinarily will be admitted, and the jury will

ultimately determine its worth." *Perry*, 2012 WL 75048 at *3.

### A. THERON LEWIS' MOTION TO SUPPRESS (Doc. 27)

Defendant Theron Lewis moves to suppress identification testimony of three

witnesses: (1) Dwayne Burg, Jr.; (2) Torrence Burg; and (3) Brandy Hurston. Lewis

argues that all three witnesses failed to identify Theron Lewis "at or temporally near the

time of the shooting[,]" and that the identifications were made over two years after the

robbery and only after viewing a photograph of Lewis on the WHIO news broadcast

reporting his arrest in connection with a separate shooting incident. The crux of Lewis'

argument concerning these three witness is that law enforcement's use of the same

photograph displayed on the WHIO news broadcast in the photo lineups rendered them

unduly suggestive.[6]

> 1.      Identification of Theron Lewis by Dwayne Burg, Jr.

Within ten days after learning that Dwayne Burg, Jr. identified Theron Lewis from

---

[6] Lewis does not appear to challenge identifications made directly from viewing the WHIO news broadcast in and of itself.  Such a due process challenge would fail in light of the Supreme Court's decision in *Perry*, 2012 WL 75048, in which the court rejected defendant's contention that "it should make no difference whether law enforcement was responsible for creating the suggestive circumstances that marred the identification."  *Id*. at *7-9.  Instead, the court concluded that law enforcement must be responsible for the suggestiveness of the lineup in order to trigger the due process check.  *Perry*, 2012 WL 75048 at *7-8.  The court in *Perry* specifically noted that the due process check would not apply where "a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned 'theft suspect[.]'" *Id*. at *9.

Before *Perry* (published 9 days ago), the Sixth Circuit applied the two-step test even in instances where the witness' identification involved no police involvement.  *See Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)*, cert. denied*, 482 U.S. 918 (1987).  In *Thigpen*, the Sixth Circuit held "that police machinations" are not required in determining suggestiveness because, contrary to the court's conclusion in *Perry*, "deterrence of police misconduct is not the basic purpose for excluding identification evidence."  *Id*.

In *United States v. Monsour*, 893 F.2d 126, 128 (1990), a witness identified defendant as a bank robbery suspect after viewing defendant's photograph in a newspaper accompanied by an article indicating that defendant was "linked" to the robbery.  *Id*. at 128.  Notably, the bank teller's co-worker and an FBI agent called the newspaper photo to the teller's attention.  In determining whether the news photo identification was impermissibly suggestive[,]" the Sixth Circuit stated its analysis involved "two inquiries[,]" namely "whether the viewing of the newspaper photo was unduly suggestive" and "[i]f so . . . whether, under the totality of the circumstances, there was sufficient independent indicia of the reliability of [the] identification[.]"  *Id*. (citing *Biggers*, 409 U.S. at199-200; *Thigpen*, 804 F.2d at 895).  Despite finding that "the news photo in addition to the manner in which [the teller's] attention was directed to the photo made it suggestive[,]" the court nevertheless concluded "that there was sufficient independent indicia of reliability to keep the identification from becoming fatally tainted[.]"  *Id*.

While *Monsour* involved some, though minimal, police conduct, *i.e.*, an FBI agent calling the article to the witness' attention, the case of *United States v. Edwards*, 949 F.2d 397, 1991 WL 256706 (6th Cir. 1991) presents no police involvement.  Instead, the witness in *Edwards* simply saw defendant's picture in a local newspaper and contacted the FBI.  *Id*. at *2.  There, while the court concluded that, "[u]nquestionably, the newspaper photo was suggestive[,]" the witness' identification was nonetheless reliable.  *Id*. (citing *Monsour*, 893 F.2d at 128).

a photo displayed on a WHIO news broadcast, Detective Galbraith presented a photo lineup to Dwayne Burg, Jr. containing the same photo of Lewis displayed on the news.[7] The question presented is whether presenting a photo lineup containing the same photo of Lewis displayed on the news broadcast renders the lineup unduly suggestive.[8]

Even assuming the photo lineup was unduly suggestive, the identification is sufficiently reliable for the jury to "determine its worth." *Perry*, 2012 WL 75048 at *3. Dwayne Burg, Jr. testified that the first intruder wore nothing covering his face, and other evidence establishes that he was in the same apartment bedroom where the first intruder stood throughout the robbery.[9] While Dwayne Burg, Jr. glanced at the second intruder at times, his attention was otherwise focused on the first intruder throughout the one to two minutes the intruder was in the bedroom. Further, upon seeing the news broadcast and the subsequent photo lineups, Dwayne Burg, Jr. was "100 percent" certain that Lewis was the first intruder. Dwayne Burg, Jr.'s opportunity to view the suspect at the time of the crime, his degree of attention at the time of the crime, and his level of certainty in his

---

[7] Detective Galbraith testified that he never saw the WHIO news broadcast. (Doc. 52, PAGEID 387).

[8] One court, without much analysis, overruled the contention that use of the same photograph displayed in a news broadcast in a subsequent photo lineup is unduly suggestive. *United States v. Lang*, No. CRIM A. 04-11, 2005 WL 517337, at *4 (E.D. La. Mar. 2, 2005). In *Lang*, three victims of a robbery identified defendant as their robber after they "saw a television news broadcast" reporting about separate incidents, "during which a photograph of [defendant] was shown." *Id.* Days later, the victims immediately identified defendant in "a six-person photographic line-up at their home" that contained the same picture of defendant shown on the news broadcast. *Id.*

[9] Torrence Burg, who was in the same room as Dwayne Burg, Jr. during the robbery, testified that he was merely an arm length and a half away from where the first intruder stood.

identification favors reliability.

Defendant argues that Dwayne Burg, Jr.'s identification of Lewis is unreliable because he initially told police that the first intruder's face was covered by a shirt. However, during the suppression hearing, Dwayne Burg, Jr. denied ever making any such statement to police, and all other witnesses having seen the first intruder at the time of the robbery similarly testified at the suppression hearing that the first intruder's face was uncovered during the robbery.

Further, Detective Galbraith testified that the witnesses identified the first intruder as an individual without any face covering. (Doc. 52, PAGEID 361). To the extent witnesses gave conflicting descriptions to other police officers regarding face covering during the robbery, Detective Galbraith testified that such statements were "not definitive," and that conflicting statements to officers immediately following an event is not uncommon. (Doc. 52, PAGEID 404). Based on all of the foregoing, the Court concludes that this purported conflict, as apparently memorialized in a police report, is insufficient to render the identifications wholly unreliable.

Finally, Lewis points to the time lapse between the crime and the identification as a significant factor undermining the reliability of Dwayne Burg, Jr.'s identification. The Court concludes that the time lapse, in and of itself, does not render the identification unreliable in light of the other factors tending to favor reliability. *See United States v. Hill*, 967 F.2d 226, 233 (6th Cir. 1992) (concluding that, while a time lapse of five years between a robbery and identification "detract[s] somewhat from the reliability of [the]

identification[,]" it was insufficient to render the identification inadmissible in light of other factors favoring reliability).

Accordingly, Defendant Theron Lewis' Motion to Suppress is **DENIED** as it relates to the identification testimony of Dwayne Burg, Jr.

2.    Identification of Theron Lewis by Torrence Burg

With regard to the identification made by Torrence Burg, even assuming the photo lineup presented to Torrence Burg was unduly suggestive, the Court concludes that it is sufficiently reliable for the jury to "determine its worth." *Perry*, 2012 WL 75048 at *3. According to Torrence Burg, the first intruder was his main focus throughout the robbery and estimated that he had the opportunity to view the intruder for 5 to 10 minutes. He testified that the first intruder was no more than an arm's length and a half from him when the intruder shot his father, and upon seeing the lineup, he was 100 percent certain that Lewis was the first intruder and the person who shot his father. Thus, Torrence Burg's opportunity to view the suspect at the time of the crime, his degree of attention at the time of the crime, and his level of certainty favor reliability.

In challenging the reliability of Torrence Burg's identification, Lewis contends that Torrence Burg initially told police that the first intruder may possibly have worn a bandanna in an attempt to conceal his face. However, Torrence Burg testified at the suppression hearing that, while he told police one of the intruders may have worn a bandanna, he did not make any such statement with regard to the first intruder. (Doc. 51, PAGEID 283). As set forth above, the purported description discrepancy and the lapse in

time between the crime and identification are insufficient to render the identification wholly unreliable in light of the other factors favoring reliability.

Therefore, Defendant Theron Lewis' Motion to Suppress is **DENIED** as it relates to identification testimony of Torrence Burg.

3.  Identification of Theron Lewis by Brandy Hurston

While Brandy Hurston identified Keith Watson immediately upon viewing the WHIO news broadcast, she did not identify Theron Lewis as one of the intruders. Specifically, Ms. Hurston testified that "[she] was able to identify Keith [Watson] right away when [she] saw the news" but "wasn't able to identify the other guy that was next to him at the time." (Doc. 51, PAGEID 325).

Thereafter, Ms. Hurston spoke to her brothers about the broadcast and they informed her that they identified Theron Lewis as the person who shot their father. (Doc. 51, PAGEID 325). In July 2009, approximately three weeks after her brothers identified Lewis in a photo lineup, Detective Galbraith presented Ms. Hurston with the exact same lineup featuring the exact same photo of Lewis displayed on the news. Ms. Hurston described that encounter and her subsequent identification as follows:

> Q.  All right. So when Detective Galbraith presented this photo spread lineup to you, you had pieced together, because you had seen Theron Lewis on the news and you had heard what your brothers had said, that Theron was the guy that was in the bedroom, is that what your testimony is?
>
> A.  Basically, yes, sir.

(Doc. 51, PAGEID 327).

Ms. Hurston's testimony raises serious concerns over whether her identification is reliable. Certainly, her opportunity to view the intruder and her degree of attention at the time of the robbery were limited. Ms. Hurston's only opportunity to view the first intruder was "a glance . . . from the side" as the first intruder "crossed over" her to leave the residence as Ms. Hurston laid on the floor. (Doc. 51, PAGEID 331). Also cutting against the reliability of her identification is the fact that she could not identify Lewis as an intruder upon viewing the exact same photo on the news, and now admits that her identification from the lineup was based on seeing Lewis' photo on the news broadcast and knowing her brothers identified Lewis as an intruder. Finally, further detracting from the reliability of Ms. Hurston's identification is the time lapse between the crime and her identification, especially where no other factor favors reliability.

But before reaching the inquiry regarding reliability, the Court must first determine whether the lineup was unduly suggestive. The Supreme Court of the United States recently clarified that due process protection is triggered only when the suggestiveness results from law enforcement action.[10] *Perry*, 2012 WL 75048 at *7-9. The Court in *Perry* explicitly noted that "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure

---

[10] Applying the analytical framework employed by the Sixth Circuit in *Monsour* and *Edwards*, the Court would conclude that, in light of the circumstances surrounding her identification, *i.e.*, her viewing of the news and the conversation with her brother, the photo lineups were unduly suggestive regardless of police arrangement.

to be suggestive."[11]  *Id*. at *3, n1.

Here, the Court concludes that law enforcement used an unnecessarily suggestive identification procedure in securing Ms. Hurston's identification of Lewis, whether intended or not.  By June 8, 2009, Detective Galbraith knew that Lewis' photo was displayed on the news, that, at the least, Dwayne Burg, Jr., identified Lewis as an intruder from viewing the news broadcast, that Dwayne Burg, Jr. discussed the news broadcast with family members and that both Dwayne Jr. and Torrence Burg identified Lewis in the photo lineup.  Nevertheless, approximately three weeks later, on July 1, 2009, without apparently attempting to view the substance of the news broadcast in the meantime, and without inquiring of Ms. Hurston whether or not he she had spoken to her brothers about their identifications, simply presented Ms. Hurston with the exact same lineup containing the photo of Lewis that was displayed on the news.

Under the circumstances presented here, the Court concludes that detectives used an unnecessarily suggestive identification procedure with regard to Ms. Hurston, whether intentional or not.  Having already concluded that Ms. Hurston's identification bears no independent indicia of reliability, Defendant Theron Lewis' Motion to Suppress is **GRANTED** as it relates to the identification testimony of Brandy Hurston.

---

[11] Justice Sotomayor, in a dissenting opinion in *Perry*, disagreed with what she believed to be the majority's apparently implicit requirement of some "degree of intentional orchestration or manipulation" by police in order to trigger the due process analysis. Perhaps this case illustrates the circumstances contemplated by Justice Sotomayor in her dissenting opinion, *i.e.*, a circumstance where "eyewitness identifications derived from suggestive circumstances that were not police manipulated – however suggestive, and however unreliable" would nonetheless be admissible absent law enforcement contributing to the suggestiveness.  *Perry*, 2012 WL 75048, at *15.

# B.  KEITH WATSON'S MOTION TO SUPPRESS (Doc. 28)

Two victim witnesses made identifications of Keith Watson as the third intruder: (1) Cassandra Powers; and (2) Brandy Hurston.  Keith Watson moves to suppress those identifications as unduly suggestive, in violation of his due process rights.

## 1.      Identification of Keith Watson by Cassandra Powers

Watson argues that Cassandra Powers' identification, made on January 24, 2010, is unduly suggestive.  Specifically, Watson points to the fact that Detective Gaier presented a lineup to Ms. Powers on January 22, 2010, and, after viewing that lineup, Ms. Powers could only narrow the possibility of suspects to Watson, displayed in the first photo, and the suspect displayed in the fourth photo.  (Gov.'t Exhibit 8).  Only two days later, on January 24, 2010, Detective Gaier presented Ms. Powers with a second lineup containing a different photo of Watson.  (Gov.'t Exhibit 9).  In that second lineup, in which Ms. Powers identified Watson, his photo was the fourth photo in the lineup and he was the only suspect that also appeared in first lineup.

Watson argues that his appearance as the only suspect in the two lineups presented to Ms. Powers within days of each other, as well as placing his photo as the fourth suspect in the second lineup, renders it unduly suggestive.[12]  (*See* Gov.'t Exhibits 8, 9).  In support

---

[12]  Watson also argues that the lineup procedures were unduly suggestive because detectives failed to use blinded or sequential lineup procedures.  Beyond pointing out the fact that neither blinded nor sequential procedures were utilized, Watson points to nothing indicating that the non-blinded, non-sequential procedures used either rendered or contributed to rendering the lineup unduly suggestive under the circumstances.  Further, Watson cites no authority for the

of his arguments, Watson cites *Foster v. California*, 394 U.S. 440 (1969), and contends

that presenting two lineups where only one suspect appears in both lineups is unduly

suggestive, akin to detectives telling Ms. Powers that "[t]his is the man." The *Foster* case

is distinguishable because, here, the two lineups, independently, are not suggestive. Also,

as opposed to *Foster*, DPD detectives did not arrange for a "one-to-one confrontation

between [defendant] and witness" in between presentation of the two lineups. *Id*. at 443.

Also of significance, the Court notes that the lineups use two different photos of

Watson and Watson appears different in each. *See Gregory-Bey v. Hanks*, 332 F.3d 1036,

1052 (7th Cir. 2003) (stating that "repeated showing of a suspect's picture in police photo

arrays is not unduly suggestive if the photos do not resemble each other") (citing *Stewart v.

Duckworth*, 93 F.3d 262, 265-66 (7th Cir.1996); *United States v. Donaldson*, 978 F.2d

381, 386-87 (7th Cir.1992)). In the first lineup, the photo of Watson was taken over two

years after the incident. In that photo, Watson's head fills most of the frame, his face

appears full and rounded, he has short hair, a beard and a light moustache. (Gov.'t Exhibit

8). Watson's photo in the second lineup was taken approximately two weeks after the

robbery at 1637 Harold Street. In that photo, Watson's head does not fill the entire frame,

his face appears thin and less rounded, he has braided hair tied close to his head with

braids dangling down from the back, a beard and a thick moustache. (Gov.'t Exhibit 9).

Based on the differences in the two photos, the Court concludes that the lineups are not

---

purported proposition that failure to use either a blinded or sequential lineup procedure
inherently renders the lineup unduly suggestive.

unduly suggestive.

Even assuming the procedures used in administering the photo lineups were unduly suggestive, the Court concludes that Ms. Powers' identification is sufficiently reliable under the circumstances to allow a jury to determine its weight in light of Watson's concerns. While Ms. Powers was "face down" in the kitchen throughout the robbery, the third intruder was in her direct line of vision approximately 25 to 30 feet away from her. Ms. Powers testified that she viewed the third intruder throughout the robbery, a time frame she estimated was five to eight minutes. Because the intruder was unmasked, Ms. Powers had a good opportunity to his face. Ms. Powers' opportunity to view the third intruder and degree of attention favors reliability.

With regard to the accuracy of her previous description, Watson contends that Ms. Powers' description of the third intruder immediately after the incident does not completely match Watson's depiction in the lineup photos. While Watson takes no issue with Ms. Powers' height, weight, build and complexion description, he does point to Ms. Powers' description of the third intruder as "clean shaven," and her lack of description concerning the third intruder's hairstyle (Powers testified at the suppression hearing that the third intruder had a "short cut"). Watson then points to his photo the second lineup, taken approximately two weeks after the robbery, in which Watson appears with a beard, thin moustache and braided hair. (Gov.'t Exhibit 9).

Even though the picture of Watson in the second lineup was taken weeks after the robbery in this case, the fact that the lineup photo depicts Watson with facial hair and

braids does not render the identification wholly unreliable. Facial hair and hairstyles are easily changed. In fact, the photo lineup itself instructs the witness to "[k]eep in mind that hair styles, beards and moustaches may be easily changed." (Gov.'t Exhibit 9). With regard to hairstyle, while Ms. Powers testified that the third intruder had a short cut and the second lineup photo depicts Watson with braids, Watson's braids are tied close to his head. As stated by Detective Gaier::

> braided hair can also be tied back so it could be portrayed as short
> hair if you're looking at an individual from a different point of view.
> Just in this jail photograph, the braids are loose. So it really depends
> on the style of hair of that day. It could be bundled up and be
> portrayed as short.

(Doc. 52). Given the apparent accuracy of Ms. Powers description of the third intruder concerning height, weight, build and complexion, discrepancies between Ms. Powers' description of the third intruder's facial hair and hairstyle, *i.e.*, features that are easily changed, do not render Ms. Powers' identification fatally unreliable.

While Ms. Powers' 80 percent level of certainty in her identification[13] and the significant time lapse between the crime and Ms. Powers identification detract from the reliability of her identification,[14] given the other factors considered weighing in favor of

---

[13] Detective Gaier testified that Ms. Powers was "100 percent [certain] that was the individual that was at the front door of the apartment during this incident." (Doc. 52, PAGEID 432).

[14] *See United States v. Freriks*, No. 3:10-CR-0106-TMB-DMS, 2011 WL 1302922, at *9 (D. Alaska Apr. 5, 2011) (concluding that an 80 level of certainty "when combined with the lapse of three months between the event at issue and the identification," led to the conclusion that the witness' "identification was not so reliable as to outweigh taint of the suggestive identification procedure").

finding Ms. Powers' identification reliable, the Court concludes that Ms. Powers' identification is sufficiently reliable to allow its admission at trial and permit the jury to determine its ultimate worth.  Accordingly, Keith Watson's Motion to Suppress, as it relates to the identification of Cassandra Powers, is **DENIED**.

2. <u>Identification of Keith Watson by Brandy Hurston</u>

Defendant Watson also challenges Brandy Hurston's January 22, 2010 identification of him from a photo lineup.  Watson argues that the photo lineup presented to Ms. Hurston is suggestive because it was created with him as the target, that Watson's inclusion was not based on any witness description of the third intruder, and instead, that Watson's photo was placed in the lineup simply because he was a known associate of Theron Lewis.  Even based on the assumption that the lineup is unduly suggestive, the Court concludes that it is sufficiently reliable for the jury to determine its weight.

Ms. Hurston testified that she was only five to six steps from the front door where the third intruder was located, and during the robbery, she had multiple opportunities to have a long, steady look at the third intruder, who wore no mask covering his face.  While Ms. Hurston's attention was not exclusively focused on the third intruder throughout the entire robbery, her attention was certainly drawn directly to the third intruder who continuously pointed a gun at her yelling, "shut up, Bitch, quit looking at me."  Further, Ms. Hurston's attention was also particularly drawn to the area of the third intruder because her one-year old son was sleeping "right next" to him during the robbery.  Ms. Hurston's opportunity to view the third intruder, her degree of attention at the time of the

robbery, and her stated degree of certainty in the identification favor reliability.

In arguing that Ms. Hurston's identification was unreliable, Watson again argues that Ms. Hurston's prior descriptions of the third intruder near the time of the robbery differed from Watson's appearance in the photo taken of him weeks after the robbery. Watson argues that Ms. Hurston initially described the third intruder as having a clean shaven face and a short haircut, whereas a photo of Watson taken two weeks after the robbery shows him with braided hair and facial hair. Watson also points to the significant time lapse between the robbery and the ultimate identification.

As set forth above, the inconsistencies in Ms. Hurston's prior description and the photo taken of Watson two weeks after the robbery do not render the identification unreliable. Further, although the time lapse between the robbery and identification is significant and detracts from the reliability of the identification, in light of the other factors weighing in favor of reliability, the lapse in time does not render Ms. Hurston's identification of Watson inadmissible. Ultimately, the jury will weigh the reliability of Ms. Hurston's identification in light of the concerns expressed by Watson. Accordingly, Defendant Watson's Motion to Suppress is **DENIED** as it relates to Ms. Hurston's identification of Keith Watson.

## IV. CONCLUSION

Accordingly, based on all of the foregoing, Defendant Theron Lewis' Motion to Suppress (Doc. 27) is **GRANTED** as it relates to the identification testimony of Brandy Hurston, and is **DENIED** in all other respects. Defendant Keith Watson's Motion to

23

Suppress (Doc. 28) is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Date: 1/20/2012

Timothy S. Black
United States District Judge